IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHERON SHELTON, Individually                    Civil Action

          Plaintiff,                           No. 2:22-cv-266-CB

     v.

 COUNTY     OF     ALLEGHENY,
PENNSYLVANIA;  Allegheny  County
Police  Homicide  Command  Officer
SCOTT     SCHERER,     Individually;
Allegheny  County  Police  Homicide
Detectives  STEPHEN  HITCHINGS,
TODD DOLFI, THOMAS FOLEY, Adam
Anderson, Administrator of the Estate of
PATRICK MILLER, Deceased, PATRICK
KINAVEY,  and  JAMES  GRILL,  SR.,
Individually;

          Defendants.

**<u>BRIEF IN SUPPORT OF MOTION TO DISMISS</u>**

AND NOW COME Defendants, County of Allegheny, Scott Scherer, Stephen

Hitchings, Todd Dolfi, Thomas Foley, Estate of Patrick Miller, and James Grill (County

Defendants), by and through their counsel Dennis Biondo Jr. and Shelley Rohrer,

Assistant Allegheny County Solicitors and submit this Brief in Support of Motion to

Dismiss.

## I.    PROCEDURAL HISTORY

Plaintiff filed his Complaint on February 11, 2022. (ECF No. 1). The parties met

and conferred on March 29, 2022. Plaintiff filed his First Amended Complaint on May 2,

2022. (ECF No. 6). On June 13, 2022, the Allegheny County District Attorney's Office filed

a Motion to Intervene. (ECF No. 7). On June 14, 2022, the Court denied without prejudice

the District Attorney's Motion to Intervene and ordered the parties to meet and confer. (ECF No. 9). The parties did meet and confer on June 30, 2022, and Plaintiff filed his Second Amended Complaint on August 30, 2022. (ECF No. 12). This Second Amended Complaint resolved the issues raised by the District Attorney's Office. On September 8, 2022, the County filed an unopposed Motion for Extension to Respond to Second Amended Complaint. (ECF No. 16). The Court granted this motion on September 8, 2022, permitting the County to respond by November 1, 2022. (ECF No. 17).

## II.    FACTS

On March 9, 2016, at approximately 10:50PM, five adults and one unborn child were shot and murdered during a cookout in Wilkinsburg, Pennsylvania. (ECF No. 12 at ¶5). This incident has been referred to as the "Wilkinsburg Massacre." The victims who were murdered were Brittany Powell, Tina Shelton, Shada Mahone, Chanetta Powell, Ms. Powell's unborn male child, and Jerry Shelton. (ECF No. 1-003 "Exhibit C" at p.13–14)[1].

Three other victims were shot and injured, and one of those victims passed away on September 15, 2020). (ECF No. 12 at ¶¶5–6). These victims were Lamont Powell, John Ellis, and Tanjia Cunningham. (ECF No. 1-003 "Exhibit C" at p. 13).

Allegheny County Police detectives learned that Lamont Powell, was a suspect in the murder of Calvin Doswell that occurred on October 15, 2013. (ECF No. 1-003 "Exhibit C" at p.15). Detectives learned that Cheron Shelton and Calvin Doswell were best friends. (ECF No. 1-003 "Exhibit C" at p.15).

---

[1] Throughout the Second Amended Complaint, Plaintiff's reference exhibits that are only attached to the original complaint. These Defendants similarly cite to the relevant exhibits.

Allegheny County Police investigated the Wilkinsburg Massacre and determined that there were two shooters involved, one who used a pistol to frighten and trap the victims, and another who used an assault rifle to injure and kill the victims. (ECF No. 12 at ¶¶41–46). Allegheny County Police developed two suspects in the Wilkinsburg Massacre, Cheron Shelton and Robert Thomas.

Officer Adams of the Wilkinsburg Police Department was on routine patrol when he heard numerous gunshots in the area of Franklin Avenue in Wilkinsburg at 10:53PM. (ECF No. 1-003 "Exhibit C" at p.14). Officer Adams drove to the area of the gunshots and observed a black male, thin build and short or no hair walking casually on Franklin Avenue. (ECF No. 1-003 "Exhibit C" at p.14). The area where Officer Adams observed the male on Franklin Avenue is less than a tenth of a mile from the scene of the shooting. (ECF No. 1-003 "Exhibit C" at p.14). Officer Adams noted that the male got into a white Lincoln Continental with the license plate PA JBP2200 and drove away. (ECF No. 1-003 "Exhibit C" at p.14). The white Lincoln Continental was registered to Brittany D. Shelton and Desdrene M. Smith, 1214 Nolan Court, Pittsburgh, Pennsylvania. (ECF No. 1-003 "Exhibit C" at p.14).

During the course of the investigation, detectives received numerous anonymous tips in reference to the Wilkinsburg Massacre that indicated that the actors were from an area commonly referred to as "Hill Top," which is in the Homewood North Section of Pittsburgh. (ECF No. 1-003 "Exhibit C" at p.14). Detectives also received tips that the actors lived on Nolan Court, and that the shooting was in retaliation for a previous murder that took place in the Homewood North Section of Pittsburgh. (ECF No. 1-003 "Exhibit C" at p.14).

Detective Kevin McCue obtained surveillance video in the area of Nolan Court for a period of time before and after the murders. (ECF No. 1-003 "Exhibit C" at p.14). The video depicted a man identified as Cheron Shelton get into a white Lincoln sedan at Nolan Court at approximately 10:28PM on March 9, 2016. (ECF No. 1-003 "Exhibit C" at p.14). The video showed Cheron Shelton move the vehicle onto a concrete pad between 1200 and 1208 Mohler Street, exit the car, run into the backyard of 1214 Nolan Court, retrieve a long, slender, ridged object that appeared to be covered by a piece of clothing, reenter the vehicle with the object, and drive away at approximately 10:30PM on March 9, 2016. (ECF No. 1-003 "Exhibit C" at p.14).

In the surveillance video from Nolan Court, Detective McCue observed two males who were identified as Cheron Shelton and Robert Thomas jump a fence at 1244 Nolan Court coming from the direction of the woods behind Nolan Court at 11:45PM on March 9, 2016. (ECF No. 1-003 "Exhibit C" at p.14). Cheron Shelton then entered the rear of 1214 Nolan Court at 11:46PM on March 9, 2022, and Robert Thomas entered the rear of 1214 Nolan Court at 11:47PM on March 9, 2016. Then Cheron Shelton and Robert Thomas exited 1214 Nolan Court at 12:23AM on March 10, 216, and Cheron Shelton appeared to have changed his clothes. (ECF No. 1-003 "Exhibit C" at pp.14–15).

During the course of the investigation, detectives recovered video from a private residence on Franklin Avenue that showed a vehicle that matched the description of the white Lincoln sedan that Cheron Shelton was driving pull onto Franklin Avenue at approximately 10:42PM. (ECF No. 1-003 "Exhibit C" at p.14).

Cheron Shelton was field contacted at approximately 2:18AM on March 9, 2016 by Penn Hills Police Department officers after a report of suspicious individuals near a vacant house. (ECF No. 1-003 "Exhibit C" at p.21).

Detectives executed a search warrant at 1214 Nolan Court on March 12, 2016 and recovered a Colt Model M4 carbine .22 long rifle semi-automatic rifle with Cheron Shelton's left thumb print on it.[2] (ECF No. 1-003 "Exhibit C" at p.15). Mr. Shelton was arrested at 6914 Hartmans Lane in Pittsburgh on March 25, 2016 for being a Person Not to Possess a Firearm and was incarcerated in the Allegheny County Jail ("ACJ"). (ECF No. 1-003 "Exhibit C" at p.16).

While in ACJ, on March 19, 2022 Cheron Shelton placed a phone call to 412-731-2607 indicating that he will write a "Kite" and "lay it all out." "Kite" is a word that was known to detectives to mean a letter in jail parlance. (ECF No. 1-003 "Exhibit C" at p.16). On April 1, 2016, detectives executed a search warrant on Cheron Shelton's outgoing mail from ACJ. An envelope addressed to 6914 Hartman Lane in Pittsburgh was seized. (ECF No. 1-003 "Exhibit C" at p.16). Channel Falls, Cheron Shelton's girlfriend and the mother of his children, and Adrien Shaw Falls, Channel Falls' father, both were present at 6914 Hartman Lane when Cheron Shelton was arrested. (ECF No. 1-003 "Exhibit C" at p.16).

The envelope that was seized contained a letter addressed to "Brown Sugar" and a letter addressed to "Pops." (ECF No. 1-003 "Exhibit C" at p.16). In the letter addressed to "Pops", Cheron Shelton wrote that he needed him to do "some real shit." He wrote that "Round the corner at Bubbie house I got something there than I was workin on getn rid of....you don't got to do nutn but open the door & guide my n[----] to it. Its downstair next to the lawn mowers wrap & ready to be toss." In that same letter, Cheron Shelton directed "Pops" to call 513-6784 that he indicated is "his #" or 651-5092 which he indicated is "girl #" and ask for "house." (ECF No. 1-003 "Exhibit C" at p.16). Detectives learned through

---

[2] This firearm was not determined to have been involved in the Wilkinsburg Massacre.

their investigation that 412-513-6784 and the nickname "millhouse" or "house" (sometimes spelled with a "z") are associated with Robert Thomas, and the number 412-651-5092 to be associated with Tara Gomez, Robert Thomas's girlfriend. (ECF No. 1-003 "Exhibit C" at p.17). In the letter, Cheron Shelton instructed "Pops" to "burn this when done reading." (ECF No. 1-003 "Exhibit C" at p.17).

During the course of their investigation, detectives determined that the phone number 412-892-0447 belonged to Cheron Shelton. (ECF No. 1-003 "Exhibit C" at p.17). Detectives applied for a Court Order to obtain cellphone records belonging to T-Mobile number 412-892-0447. (ECF No. 1-003 "Exhibit C" at p.17). These records revealed multiple contacts with the number 412-378-3461 around the time of the Wilkinsburg Massacre. (ECF No. 1-003 "Exhibit C" at p.17).

Detectives Patrick Kinavey and Venerando Costa applied for a search warrant to place a small video recording device in a visitation room in POD 8E of ACJ for the purpose of capturing any non-verbal communication between Cheron Shelton and his father Robert Shelton during a pre-scheduled face-to-face meeting on April 6, 2016. (ECF No. 1-003 "Exhibit C" at p.17). On April 6, 2016, the video appeared to show Cheron Shelton using various hand signals and mouthing various things to Robert Shelton, and motioning to Robert Shelton to write something down. Cheron Shelton appeared to pantomime the holding of a rifle and the squeezing of the trigger. He also appeared to pantomime a lawn mower motion and a tossing motion. (ECF No. 1-003 "Exhibit C" at pp.17–18).

On April 6, 2016, confidential informant Kendall Mikell attempted to contact Allegheny County Police Inspector Palmer about information he had regarding Robert Thomas's involvement in the Wilkinsburg Massacre. (ECF No. 1-003 "Exhibit C" at p.18). Kendall Mikell was interviewed at Allegheny County Homicide Office on April 7, 2016.

(ECF No. 1-003 "Exhibit C" at p.18). He explained that Robert Thomas was on the same pod at ACJ as him, and that Thomas said he was concerned because the detectives took DNA from him on the Wilkinsburg case. (ECF No. 1-003 "Exhibit C" at p.18). Mikell asked Thomas whether he left his DNA at the scene, and Thomas said that he urinated in the corner of the garage right next to the scene. Thomas described the garage as not having a roof. (ECF No. 1-003 "Exhibit C" at p.19). Mikell told detectives that Thomas told him "I don't know why my man would try to write me letters," that letters got intercepted, and that's how he thinks he became a suspect. (ECF No. 1-003 "Exhibit C" at p.19).

Kendall Mikell told detectives that when he mentioned that police would be searching for the firearms, Thomas told him "I'm cool, I'm cool! They gonna have to go deep sea diving for mines!" When Mikell asked Thomas "So what did you have, the handgun?" Thomas replied, "Yeah." When Mikell asked "Is the Chop still out there?" Thomas answered "Yeah." (ECF No. 1-003 "Exhibit C" at pp.19–20). According to detectives, "Chop" or "Chopper" is slang for an AK-47 style rifle. (ECF No. 1-003 "Exhibit C" at p.20). Mikell told detectives that Thomas said he "hit dude . . That's who we was trying to get." Thomas explained that that man "killed, robbed him caught him outside . . . and killed him" referring to "your man" who was killed "like 2 years ago." (ECF No. 1-003 "Exhibit C" at p.20). Mikell told detectives that Thomas explained "I hit him in his neck, shoulder, I think his leg, and I think his hand." (ECF No. 1-003 "Exhibit C" at p.20). Victim Lamont Powell was hit in the neck, shoulder, and hand. (ECF No. 1-003 "Exhibit C" at p.20).

Kendall Mikell told detectives that Thomas said that he and the other shooter ran to the car, that Thomas didn't get in the car but kept running, that the other shooter got in the car, and that the other shooter later told Thomas "I think someone seen me, I think

a cop seen me." (ECF No. 1-003 "Exhibit C" at p.20). At the time Kendall Mikell reached out to law enforcement with this information, only investigators knew that Officer Adams from the Wilkinsburg Police observed an individual near the scene of the shootings enter a vehicle. (ECF No. 1-003 "Exhibit C" at p.20).

Kendall Mikell told detectives that Thomas told him that "we go somewhere in the woods, jumped a fence, and his man had a duffle bag, they went in the house and he said his man changed his clothes....Then we came back out and we left." (ECF No. 1-003 "Exhibit C" at p.21). Kendall Mikell told detectives that Thomas told him that they were about to get rid of the "Chopper", the other shooter was about to go get it and a cop pulled up and questioned him, and that Thomas was still in the car and ducked down in his seat. (ECF No. 1-003 "Exhibit C" at p.21). The information regarding Cheron Shelton being field contacted March 9, 2016 at approximately 2:18AM by Penn Hill Police after a report of suspicious activity near a vacant house was not released to the public and was only available in investigative materials. (ECF No. 1-003 "Exhibit C" at p.21).

On April 7, 2016, Detectives Caruso and McCool interviewed confidential informant Frederick Collins. (ECF No. 1-003 "Exhibit C" at p.21). Collins told detectives that on March 26, 2016, he spoke to Cheron Shelton in the ACJ. (ECF No. 1-003 "Exhibit C" at p.21). Collins told detectives that Cheron Shelton asked him if he heard about the "Calio shit." (ECF No. 1-003 "Exhibit C" at p.21). Detectives determined that Calvin "Calio" Doswell was murdered in Pittsburgh in 2013, and that the person suspected of shooting "Calio" was Lamont AKA Murder. (ECF No. 1-003 "Exhibit C" at p.21). Collins told detectives that Cheron Shelton told him that he and another individual "got the drop" on Lamont via a phone call and went over to the cookout and "ambushed them" with the "Chopper." (ECF No. 1-003 "Exhibit C" at p.21).

Collins told detectives that he also spoke to Robert Thomas in the ACJ after Thomas arrived on his POD on April 6, 2016. (ECF No. 1-003 "Exhibit C" at p.22). Collins told detectives that Robert Thomas told him that they got a call about "Murder" at a cookout in Wilkinsburg, "suited up", and waited in a garage that was nearby. (ECF No. 1-003 "Exhibit C" at p.22). Frederick Collins told detectives that Robert Thomas told him that he and Cheron were shooting at the people in the backyard, and that afterward they went to the car; however, a police officer who was driving by saw Cheron Shelton's face, so Thomas didn't get in the car. (ECF No. 1-003 "Exhibit C" at p.22). Frederick Collins told detectives that Robert Thomas told him his phone number was the same number in Cheron's, Brittany's, and Ashley's phones, listed as "House," and that he threw away that phone and got two new phones. (ECF No. 1-003 "Exhibit C" at p.22).

Cheron Shelton was charged with five counts of Criminal Homicide, Criminal Homicide of an Unborn Child, Conspiracy – Criminal Homicide, three counts of Aggravated Assault, three counts of Aggravated Assault with a Deadly Weapon, and six counts of Recklessly Endangering Another Person on June 23, 2016. (ECF No. 1-003 "Exhibit C" at pp.7–10).

Robert Thomas was charged with five counts of Criminal Homicide, Criminal Homicide of an Unborn Child, Conspiracy – Criminal Homicide, three counts of Aggravated Assault, three counts of Aggravated Assault with a Deadly Weapon, and six counts of Recklessly Endangering Another Person on June 23, 2016. (ECF No. 1-003 (Robert Thomas), "Exhibit C" at pp.6–9).

A preliminary hearing for Charon Shelton and Robert Thomas occurred on July 29, 2016. (ECF No. 12 at ¶184). On February 3, 2020, the Honorable Edward J. Borkowski dismissed the case against Robert Thomas. (ECF No. 12 at ¶212). The criminal jury trial

against Cheron Shelton took place from February 3-February 14, 2020). Cheron Shelton was found not guilty on all counts. (ECF No. 12 at ¶214).

## III.   ARGUMENT

### A.  Plaintiff has not plead a §1983 Civil Rights Conspiracy.

In order to state a claim for conspiracy under section 1983, "a plaintiff must establish (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." Gale v. Storti, 608 F.Supp.2d 629, 635 (E.D.Pa.2009) (quoting Pfannstiel v. City of Marion, 918 F.2d 1178, 1187 (5th Cir.1990) (abrogated on other grounds)). A plaintiff must allege that there was an agreement or meeting of the minds to violate his constitutional rights. Id. (citing Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir.2008)). Rosembert v. Borough of E. Lansdowne, 14 F. Supp. 3d 631, 647 (E.D. Pa. 2014). Plaintiff must provide a factual basis to support the existence of the elements of a conspiracy: agreement and concerted action. Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 295 (3d Cir. 2018). Plaintiff must demonstrate that "the state actors named as defendants in the complaint somehow reached an understanding to deny [the plaintiff] his rights." Id. In the absence of direct proof, that "meeting of the minds" or "understanding or agreement to conspire" can be inferred from circumstantial evidence. Id. Circumstantial evidence may include that the alleged conspirators "did or said something ... to create an understanding," "the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy. Id.

In the instant matter, while Plaintiff's Complaint is very detailed in its attempt to allege constitutional violations committed by Defendants, Plaintiff is very general in

his attempt to allege a conspiracy among the Defendants. The complaint does not contain the required specific facts that show an agreement or meeting of the minds nor does the Complaint allege any concerted activity on the part of Defendants. <u>Startzell</u>, 533 F.3d at 533. While the Complaint thoroughly details the investigation, it fails to allege any circumstantial evidence which would even suggest a "meeting of the minds," or an agreement among Defendants. In attempting to allege a conspiracy, Plaintiff merely restates the actions which Plaintiff alleges are violations of Plaintiff's constitutional rights and states that the Defendants "agreed amongst themselves and with other individuals, to act in concert to deprive Plaintiff" of his rights. (ECF No. 12 at ¶¶ 242–43).

Plaintiff's complaint fails to adequately allege a §1983 Conspiracy. Count III of Plaintiff's Complaint should be dismissed.

### B. Plaintiff fails to state a claim against individual defendants Kinavey, Hitchings, Grill, and Foley.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs. Liability cannot be predicated solely on the operation of *respondeat superior*." <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. <u>Id</u>.; see also <u>Keenan v. Philadelphia</u>, 983 F.2d 459, 466 (3d Cir. 1992); <u>Andrews v. Philadelphia</u>, 895 F.2d 1469, 1478 (3d Cir. 1990). Personal involvement can also be shown through proof of direct discrimination by the supervisor. <u>Andrews</u>, 895 F.2d at 1478; <u>Keenan</u>, 983 F.2d at 466. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. <u>Rode</u>, 845 F.2d at 1207; see <u>Evancho v. Fisher</u>, 423 F.3d 347, 353 (3d Cir. 2005). The factual averments

contained within a complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### i.      Patrick Kinavey

Plaintiff alleges that Defendant Patrick Kinavey (hereinafter "Kinavey") was an investigating detective and prosecuting officer in the investigation of the Wilkinsburg Massacre, and the the arrest, incarceration, and prosecution of plaintiffs. (ECF No. 12 at ¶35). Plaintiff alleges that Kinavey admitted under oath at trial that from April 6, 2016 through June 23, 2016, no additional evidence against Plaintiff Cheron Shelton was obtained which supported their allegations that he was one of the shooters involved in the Wilkinsburg Massacre. (ECF No. 12 at ¶176).

None of the actions of Defendant Kinavey are alleged to be unlawful. Additionally, Defendant Kinavey is not alleged to have had any actual knowledge of alleged unlawful actions of any of the officers.

Plaintiff has not plead any claim against Defendant Kinavey. Plaintiff's Complaint should be dismissed as to Defendant Kinavey.

### ii.     Stephen Hitchings

Plaintiff alleges that Defendant Stephen Hitchings (hereinafter "Hitchings") was an investigating detective for the Wilkinsburg Massacre and one of the prosecuting officers in the investigation of the Wilkinsburg Massacre, including the arrest, incarceration, and prosecution of plaintiffs. (ECF No. 12 at ¶136). Plaintiff alleges that Hitchings placed Robert Thomas in an interrogation room and chained him to the floor, read Thomas his Miranda Warnings, and that Thomas gave Hitchings a statement. (ECF No. 12 at ¶¶109-11). Plaintiff alleges that Hitchings, during his interrogation of Thomas, attempted to badger Thomas into confirming that (412)378-3461 is or was his

phone number. (ECF No. 12 at ¶112). Plaintiff alleges that Hitchings applied for a search warrant for white Lincoln sedan, 7167 Ross Garden Avenue, 1214 Nolan Court. (ECF No. 12 at ¶78). Plaintiff alleges that Hitchings interviewed Channel Falls. (ECF No. 12 at ¶82).

While Plaintiff alleges the active involvement of Hitchings in the investigation of a crime, none of the actions which Hitchings is alleged to have participated in during the course of the investigation rise to the level of a constitutional violation. To the contrary, Hitchings appears to have been engaged in police work while being cognizant of the rights of Plaintiff. Plaintiff has not alleged any unlawful actions on the part of Hitchings nor is he alleged to have had any knowledge of any unlawful actions committed by his fellow officers.

Plaintiff has not plead any claim against Hitchings. Plaintiff's Complaint should be dismissed as to Defendant Hitchings.

### iii. James Grill Sr.

Plaintiff alleges that Defendant James Grill Sr. (hereinafter "Grill") was an investigating detective for the Wilkinsburg Massacre homicide detective and one of the prosecuting officers in the investigation of the Wilkinsburg Massacre, including the arrest, incarceration, and prosecution of plaintiffs. (ECF No. 12 at ¶37). Plaintiff alleges that Grill gave informant Kendall Mikell "instructions" about how to respond to questions which would be asked by Detectives and was provided information pertaining to the Wilkinsburg Massacre investigation that had not yet been made public. (ECF No. 12 at ¶126). This is the only allegation of the personal involvement of Grill in the investigation of the crime that is the subject of this lawsuit.

As plead, Grill's involvement in the investigation was related to the use of a

Confidential Informant, an investigative tool used by officers. Plaintiff has not alleged any personal involvement of Grill in any unlawful actions which rise to the level of violations of the Plaintiff's Constitutional rights.

Plaintiff has not plead any claim against Grill. Plaintiff's Complaint should be dismissed as to Defendant Grill.

### iv.   Thomas Foley

Plaintiff's only allegation in the entirety of the complaint is that Defendant Thomas Foley (hereinafter "Foley") was one of the primary officers and one of the prosecuting officers in the investigation of the Wilkinsburg Massacre. (ECF No. 12 at ¶33). Plaintiff is required to plead a defendant's personal involvement in the alleged wrongs. Rode, 845 F.2d at 1207. Plaintiff fails to allege that Foley participated in, had actual knowledge of, or acquiesced to any alleged unconstitutional conduct of any of the officers.

The Complaint simply fails to state any claim against Foley. Plaintiff's Complaint should be dismissed as to Defendant Foley.

### C. Plaintiff fails to state a claim against Scott Scherer and Supervisor Defendants.[3]

In order for a supervisory official to be found legally responsible for a violation of plaintiff's constitutional rights, the official "must have played an affirmative role in the deprivation of the plaintiffs' rights...the officials' misconduct cannot be merely a failure to act." Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986); Andrews, 895 F.2d at 1478; see Rizzo v. Goode, 423 U.S. 362, 377, 96 S.Ct. 598, 607 (1976).

---

[3] It is believed that Scott Scherer is the only "Supervisory Defendant" remaining in the lawsuit. He is referenced in the Complaint as being a "supervisor" of the Wilkinsburg Massacre investigation. (ECF 12 ¶38).

Thus, a supervisor's mere failure to train, supervise or discipline subordinates will not form the basis for a § 1983 claim without proof of direct participation by the superior in some unlawful conduct. Brown v. Grabowski, 922 F.2d 1097, 1119–20 (3d Cir. 1990), cert. denied, 501 U.S. 1218, 111 S.Ct. 2827 (1991). Generally, "a supervising public official has no affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates." Mitchell v. Beard, No. CIV.A 09-972, 2010 WL 2991175, at *4–5 (W.D. Pa. July 1, 2010) report and recommendation adopted, No. 09-972, 2010 WL 2991171 (W.D. Pa. July 27, 2010). Such liability can only be imposed when "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate" can be shown. Chinchello, 805 F.2d at 133; see also Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997).

Plaintiff alleges that Defendant Scott Scherer (hereinafter "Scherer") was the Commanding Homicide Detective Officer for the investigation of the Wilkinsburg Massacre and that Scherer was one of the prosecuting officers and supervisors responsible for the oversight of the Wilkinsburg Massacre, including the arrest, incarceration, and prosecution of plaintiffs. (ECF No. 12 at ¶38). Scherer is alleged to have failed to provide adequate training, supervision, and discipline to the Defendant officers, thereby causing the individuals to deprive Plaintiffs of clearly established Constitutional rights, and directly supervised the specific investigative acts taken by the law enforcement officers in this case. (ECF No. 12 at ¶248).

Plaintiff makes no allegation that Scherer was actively involved in the investigation nor that he had knowledge of any of the alleged unlawful conduct of other officers.

Additionally, Plaintiff fails to adequately identify unconstitutionally inadequate training or supervision of Allegheny County Police Officers.

Plaintiff has not alleged sufficient personal involvement on the part of Supervisory Defendants. As such, Count IV should be dismissed with prejudice. Additionally, Defendant Scherer should be dismissed as an individual defendant in this matter as there are no allegations that Defendant Scherer participated at all in the investigation that is the subject of this lawsuit.

### D. Plaintiff Fails to State a Claim Against Defendant County of Allegheny.

Section 1983 is not a source of federal rights; it is merely a means for vindicating constitutional and federal statutory rights, a means for an injured party to sue state officials who infringe upon those rights. Albright v. Oliver, 510 U.S. 266, 271, (1994).  In any § 1983 lawsuit, the plaintiff must initially show that he was "deprived... of a right secured under the Constitution of federal law" in order to recover.  Willis v. University Health Services, Inc., 993 F.2d 837, 840 (11th Cir. 1993), cert. den. 510 U.S. 976, 114 S.Ct. 468, 126 (1993). A municipality cannot be held liable under § 1983 based on respondeat superior. Monell v. Dep't of Soc. Serv., 436 U.S. 658, 692 (1978); Pembaur v. City of Cincinnati, 475 U.S. 469, 478, 106 S.Ct. 1292 (1986); Fagan v. City of Vineland, 22 F.3d 1283, 1292 (3d Cir. 1994).

In order for a § 1983 suit against a political subdivision, such as County of Allegheny to be viable, the constitutional violation must be caused pursuant to a governmental policy or custom. Monell, 436 U.S. at 692.  A plaintiff cannot sustain a claim for municipal liability if he or she fails to allege a defendant municipality's policy or custom that causes his or her constitutional violation. Sample v. Diecks, 885 F.2d 1099,

1110 (3d Cir. 1989).

In general, municipalities, like Allegheny County, are liable under Section 1983 "only if they have caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." <u>LaVerdure v. Cnty. of Montgomery</u>, 324 F.3d 123, 125 (3d Cir. 2003) (cleaned up). The Third Circuit lists three ways a municipality can be liable for the torts of its employees. <u>McGreevy v. Stroup</u>, 413 F.3d 359, 367 (3d Cir. 2005). "First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity; second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy; third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes." <u>Id</u>. "Thus, a plaintiff can establish the existence of a custom or policy by showing either that the decision-maker possessing final authority to establish a municipal policy did so by issuing an official statement of policy or that a governmental custom developed when the official acquiesced to a course of conduct such that it operated as law." <u>Peterson v. Allegheny Cnty.</u>, No. 21-78, 2022 WL 280948, at *20 (W.D. Pa. Jan. 31, 2022).

Plaintiff has failed to allege any such policy or custom in this matter. Plaintiff does make bald assertions related to the use of unreliable and manufactured confidential informants and witness statements that law enforcement knew, or should have known, were false, thereby ignoring evidence which clearly showed the innocence of suspects. (ECF No. 12 at ¶254). Plaintiff with no specificity also alleges that the County engaged in a custom, pattern, practice, and policy of unconstitutional misconduct in homicide

investigations. Plaintiff does not point to a policymaker who makes a statement and does not provide any detail to show that the alleged investigative deficiencies are pervasive at all let alone pervasive enough to operate as law.

As such, Plaintiff has not adequately alleged a "*Monell*" claim against Allegheny County. Count V should be dismissed, and Allegheny County should be dismissed from this lawsuit.

### E.  Defendant Todd Dolfi is Immune from the State Law Malicious Prosecution claim.

Allegheny County is a political subdivision entitled to the privileges and protections of the Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa.C.S.A. §§ 8541–64.  The PSTCA envelopes Allegheny County with a broad grant of immunity for all causes of action arising under the laws of the Commonwealth of Pennsylvania.  41 Pa.C.S.A. § 8541, §8542(b).  The purpose of the PSTCA is to insulate political subdivisions and their employees from liability.  Mascaro v. Youth Study Center, 523 A.2d 1118, 1120 (Pa. 1987).  The PSTCA is to be strictly construed and narrowly interpreted in favor of limiting government liability.  Walsh v. City of Philadelphia, 585 A.2d 445, 451 (Pa. 1991).  The narrow exceptions to immunity are for: 1) use of motor vehicles, 2) care of personal property, 3) injury because of real property, 4) injury because of trees, traffic controls and streetlights, 5) injury from utilities, 6) injury from dangers in a street, 7) injury from dangers in a sidewalk, and 8) injury because of animals. 42 Pa.C.S.A. §8542.  Plaintiff fails to allege in any way that any of these exceptions to the PSTCA is implicated.  (See ECF No. 12 generally).

Additionally, any acts by employees acting within the scope of their employment with local agency are also subject to PSTCA. 41 Pa.C.S.A. § 8541, §8542(b).  At Count

VI, Plaintiff attempts to allege a Pennsylvania State Law Malicious Prosecution and Abuse of Process claim against Defendant Todd Dolfi (hereinafter "Dolfi"). (ECF No. 12 at ¶¶257-59). Dolfi is immune from such a claim under the PSTCA. Officer Dolfi is an employee of the Allegheny County Police (ECF No. 12 at ¶¶32, 34) and was acting within the scope of his duty at the time of the allegations. (ECF No. 12 at ¶34). As such, Dolfi is immune from such a state law claim.

For the foregoing reasons, any state claims are barred by Pennsylvania Political Subdivision Tort Claims Act.  Count VI should be dismissed with prejudice.

## IV.   CONCLUSION

For the foregoing reasons, Defendants move this Court to dismiss Defendants Kinavey, Foley, Hitchings, Grill, and Scherer from this lawsuit as well as dismiss Counts III, IV, V and VI of Plaintiff's Complaint for failure to state a claim.


WHEREFORE, these Defendants request the Complaint in its entirety be dismissed as to Defendants Kinavey, Foley, Hitchings, Grill, and Scherer and Counts III, IV, V and VI of Plaintiff's complaint be dismissed with prejudice.


Respectfully submitted,

*/s/ Dennis Biondo, Jr.*
Dennis Biondo, Jr.
Assistant County Solicitor
Pa. I.D. #307908
Dennis.Biondojr@alleghenycounty.us

*/s/ Shelley Rohrer*
Shelly Rohrer
Assistant County Solicitor
Pa I.D. #317166
Shelley.Rohrer@alleghenycounty.us

ALLEGHENY COUNTY LAW DEPARTMENT
300 Fort Pitt Commons Building
445 Fort Pitt Boulevard
Pittsburgh, PA 15219
(412) 350-1053

Dated:   October 31, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the BRIEF IN SUPPORT OF MOTION TO

DISMISS was served by Electronic filing upon the following:

Max Petrunya, Esquire
Max Petruyna, P.C.
5 Bayard Road, Unit 917
Pittsburgh, PA 15213
maxpetrunyapc@gmail.com

Paul Jubas, Esquire
Paul Jubas Law
P.O. Box 10704
Pittsburgh, PA 15203
pjubasesq@gmail.com

*/s/ Dennis Biondo, Jr.*
Dennis Biondo, Jr.
Assistant County Solicitor

*/s/ Shelley Rohrer*
Shelley Rohrer
Assistant County Solicitor

Dated:  October 31, 2022